**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CLAUDE A. REESE, *Plaintiff*, | No. 12-35260 |
| and | D.C. No. 2:08-cv-01008-MJP |
| CITY OF EDINBURGH COUNCIL AS ADMINISTERING AUTHORITY OF THE LOTHIAN PENSION FUND; BANKINTER GESTION DE ACTIVOS SGIIC; FRANKFURT TRUST INVESTMENT-GESELLSCHAFT MBH; FRANKFURTER-SERVICE KAPITALANLAGE-GESELLSCHAFT MBH; PIPEFITTERS LOCAL UNION #537 TRUST FUNDS, individually and on behalf of all others similarly situated, *Plaintiffs-Appellants*, | OPINION |
| v. | |
| ROBERT A. MALONE, *Defendant*, | |
| JOHN BROWNE; BP PLC; BP EXPLORATION (ALASKA), INC.; MAUREEN L. JOHNSON; STEVEN MARSHALL, *Defendants-Appellees*. | |

2                    REESE V. MALONE

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, District Judge, Presiding

Argued and Submitted
May 9, 2013—Seattle, Washington

Filed February 13, 2014

Before:  Sidney R. Thomas and Jacqueline H. Nguyen,
Circuit Judges, and Raymond J. Dearie, District Judge.[*]

Opinion by Judge Dearie

## SUMMARY[**]

### Securities Fraud

The panel affirmed in part and reversed in part the district court's dismissal of a complaint under §§ 10(b), 18(a), and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 by BP shareholders alleging that the company knowingly, or with deliberate recklessness, made false and misleading statements about the condition of Alaskan pipelines and the company's pipeline maintenance and leak detection practices prior to and in the wake of an oil spill.

[*] The Honorable Raymond J. Dearie, Senior United States District Judge for the Eastern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel held that the plaintiffs adequately pled the falsity and materiality of a statement about corrosion rate; they also adequately pled scienter as to this statement. The panel held that the plaintiffs adequately pled the falsity and materiality of two statements distinguishing pipelines; they also alleged with particularity facts giving rise to a strong inference of scienter. The panel held that the plaintiffs did not sufficiently allege scienter with respect to a statement regarding BP's "world class corrosion monitoring and leak detection systems." With respect to an annual report statement regarding compliance with environmental laws and regulations, the plaintiffs adequately pled both falsity and scienter. The panel concluded that, under a holistic analysis, the plaintiffs' allegations of scienter combined to create a strong inference of BP's deliberate recklessness as to the false or misleading nature of its public statements.

**COUNSEL**

Thomas A. Dubbs (argued), Javier Bleichmar, and Erin H. Rump, Labaton Sucharow LLP, New York, New York; Robert D. Stewart and Timothy Michael Moran, Kipling Law Group PLLC, Seattle, Washington, for Plaintiffs-Appellants.

Richard C. Pepperman II (argued) and Patrick B. Berarducci, Sullivan & Cromwell LLP, New York, New York; Diane L. McGimsey, Sullivan & Cromwell LLP, Los Angeles, California; David C. Lundsgaard, Graham & Dunn PC, Seattle, Washington, for Defendants-Appellees.

4                    REESE V. MALONE

## OPINION

DEARIE, Senior District Judge:

In March of 2006, an oil leak in one of BP's Alaskan pipelines spilled approximately 200,000 gallons of oil onto the Alaskan tundra. Despite BP's public statements suggesting that the spill was an anomaly, a second leak was discovered five months later in a different BP oil transit line in the region. As a result, the company temporarily shut down regional operations.

This class action complaint was filed by BP shareholders, who allege that the company knowingly, or with deliberate recklessness, made false and misleading statements about the condition of the pipelines and BP's pipeline maintenance and leak detection practices prior to and in the wake of the first spill. They seek relief under Sections 10(b), 18(a) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b–5, for investment losses incurred when the second spill and shutdown allegedly caused a four percent decline in BP's share price.

The district court granted defendants' motion to dismiss with prejudice. Although the court found that some of the statements were actionably false or misleading, it dismissed the claims because plaintiffs did not plead facts sufficient to show that the challenged statements gave rise to a strong inference of scienter. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse in part and affirm in part.

# I. BACKGROUND

## A. The Parties

Plaintiffs-appellants (hereinafter "plaintiffs") in this class action are purchasers of BP's common stock and American Depository Receipts ("ADRs") between June 30, 2005, and August 4, 2006.[1]    Defendants-appellees (hereinafter "defendants") in this case are: (1) BP, the largest oil and gas producer in the United States; (2) BP Exploration Alaska ("BPXA") (hereinafter "BP-Alaska"), a Delaware corporation and wholly-owned subsidiary of BP based in Anchorage, Alaska; (3) John Browne, BP's CEO during the class period; and (4) Maureen Johnson, BP-Alaska's Senior Vice President and Greater Prudhoe Bay Performance Unit Leader during the class period.

## B. BP's Corrosion Monitoring Practices and the Prudhoe Bay Spills

Prudhoe Bay, the area where the spills took place, is located on the Northern Slope of Alaska and contains more than sixteen miles of oil transit lines ("OTLs").  BP-Alaska

---

[1] On appeal, the only remaining plaintiffs are holders of BP's ADRs. "ADRs are issued by U.S. depository banks and represent 'one or more shares of foreign stock or a fraction of a share.  If you own an ADR, you have the right to obtain the foreign stock it represents.'" *Morrison v. Nat'l Australia Bank*, 547 F.3d 167, 168 n.1 (2d Cir. 2008) (citing the U.S. Securities & Exchange Commission website).  The district court dismissed claims brought by purchasers of BP's ordinary shares, which trade only on foreign exchanges.  In doing so, the district court relied on the Supreme Court's decision in *Morrison v. National Australia Bank*, 130 S. Ct. 2869, 2884 (2010), which limited the extraterritorial jurisdiction of U.S. securities laws.  Plaintiffs do not appeal the ruling.

operates "three similar low-stress pipelines" at Prudhoe
Bay—the Western Operating Area ("WOA"), the Eastern
Operating Area ("EOA"), and the Lisburne lines. There are
a variety of methods of maintaining pipelines, but the
principal process is called "pigging." "Maintenance pigging"
consists of inserting a mechanical tool to clean the inside of
the pipeline and remove debris and undesirable material.
"Smart pigging" is used to detect the presence of cracks,
corrosion, and pitting within the pipeline. According to
media coverage and the company's eventual admissions, BP
"pigged" the Prudhoe Bay OTLs infrequently and at a rate
that fell significantly below industry standards for this type of
pipeline. Instead, BP monitored for internal corrosion using
less accurate methods, including an ultrasonic device used to
measure the thickness of pipeline wall and "corrosion
coupons," small metal plates placed inside the pipeline every
ninety days to inspect for corrosion.

On March 2, 2006, an oil spill was discovered in the
WOA pipeline. Estimates suggest the leak went undetected
for at least five days, spilling approximately 4,800 barrels of
oil (about 200,000 gallons) onto the Alaskan tundra.
Subsequent investigation found that the leak was the result of
a quarter-inch wide hole in a pipeline caused by internal
corrosion. The second spill was discovered five months later
on August 5 and 6, 2006. This leak occurred in a different
corroded pipeline in the EOA, on the opposite side of
Prudhoe Bay, spilling another twenty-five barrels of oil
(about 1,000 gallons). Following the second spill, BP
temporarily shut down the Prudhoe Bay oil field, which
accounts for more than eight percent of total U.S. oil
production.

The complaint alleges that BP had ample notice of, and disregarded, corrosion monitoring deficiencies at Prudhoe Bay. In 2001, the Alaska Department of Environmental Conservation hired Coffman Engineers, Inc. ("Coffman") to evaluate a report BP submitted on its corrosion prevention efforts. Coffman raised many questions about BP-Alaska's pigging practices and ultimately concluded that "the reporting style makes it difficult to develop a qualitative understanding of the basis for [BP's] corrosion strategy."[2] Plaintiffs also claim that BP's Board of Directors was warned about the severe corrosion problems at Prudhoe Bay in 2004, when Chuck Hamel, an advocate for BP workers in Alaska, voiced concerns about corrosion and environmental threats at Prudhoe Bay. The warnings are documented in a letter from Hamel to Walter Massey, the chairman of the environmental committee of BP's non-executive board of directors, advising Massey of "serious corrosion" and predicting a "major catastrophic event."[3]

## C. Government Intervention

The first spill on March 2, 2006, received significant publicity and sparked immediate government intervention. It quickly came to light that BP had not tested the integrity of the WOA with a smart pig since 1998.

---

[2] Plaintiffs also allege that BP intervened to have the report re-written, and the questions about pigging were eliminated.

[3] The correspondence was revealed through the media after the second spill in August of 2006. The pertinent articles ran in the *Financial Times* and on MSNBC.com.

On March 15, 2006, the U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration ("PHMSA") issued a Corrective Action Order ("CAO") to BP-Alaska, addressed to defendant Maureen Johnson, Greater Prudhoe Bay Performance Unit Leader. The CAO preliminary findings identified six additional "anomalies" of internal corrosion, including one area with ninety percent corrosion and only 0.04 inches of wall remaining. It also noted the similarities between the three Prudhoe Bay Lines:

> The PBWOA [WOA line] is one of three similar low-stress pipelines operated by Respondent that feed into PS-1. . . All three pipelines were constructed around the same time, operate in similar environmental conditions, transport the same quality crude oil that contributed to the cause of the internal corrosion in PBWOA, and are operated and maintained in a similar manner by Respondent.

The order concluded that "continued operation of [BP's] WOA, EOA and Lisburne hazardous liquid pipelines without corrective measures would be hazardous to life, property and the environment." It mandated several specific corrective actions, including the requirement that BP inspect all three lines with smart pigs within certain deadlines.

Under the terms of the Corrective Action Order, BP had three months to smart pig the EOA line by June 15, 2006. It failed to do so. The FS2-FS1 segment of the EOA line was not inspected until July 22, 2006, more than a month after the deadline. The delayed results showed significant corrosion,

including sixteen different corroded areas with wall loss exceeding seventy percent, including two spots with greater than eighty percent loss. One hundred eighty-seven tested areas showed wall loss of close to fifty percent. As a result, BP decided to bypass certain parts of the pipelines instead of fixing them.

The second leak, this time in the EOA transit line, was discovered on August 5 and 6, 2006. In response, the Pipeline and Hazardous Materials Safety Administration issued Amendment No. 2 to the Corrective Action Order on August 10, 2006, adding more stringent directives and corrective actions including periodic reporting requirements and tight deadlines.

Both the Senate and the House of Representatives launched investigations regarding the spills.[4] On September 7, 2006, several BP executives were called to testify about the shutdown of Prudhoe Bay at a hearing before the House Subcommittee on Oversight and Investigations. During the hearing, Richard C. Woolam, leader of the Corrosion Inspection and Chemicals Group at BP-Alaska for many years before the spills, was asked when he became aware of the "pipeline integrity problems" at Prudhoe Bay, "including concerns about accelerated localized corrosion, microbial corrosion and [the fact] that the failure to send maintenance pigs or smart pigs down the transmission lines was placing those pipelines at high risk of failure." Mr. Woolam invoked the Fifth Amendment and refused to answer. Several parties testified that BP's maintenance practices deviated from industry standards. PHMSA Administrator Thomas J. Barrett

_____

[4] On September 12, 2006, the Senate Committee on Energy and Natural Resources held a hearing on the Prudhoe Bay spill and shutdown.

stated, "Given the multiple risk factors for corrosion in the Prudhoe Bay environment and the low velocities on these lines, it is mystifying that BP did not run cleaning pigs regularly on these transit lines. Most pipeline operators demonstrate a higher standard of care than this regardless of whether they are federally regulated or not." Kevin Hostler, President and CEO of Alyeska Pipeline Service, a pipeline design, building, and maintenance company in Alaska, testified that pigging is particularly important for low-stress lines and should be part of a routine maintenance program.

In October of 2007, BP-Alaska pled guilty to a misdemeanor violation of the Clean Water Act, 33 U.S.C. §§ 1319(c)(1), 1321(b)(3), for the negligent discharge of a harmful quantity of oil to a water of the United States, and agreed to pay a $20 million fine in settlement of federal and state criminal violations. In the plea agreement, BP admitted that it was aware of the corrosion in the WOA pipelines in 2005. BP also conceded knowledge of the company's "insufficient inspection data" on the EOA line and awareness of sediment buildup in those pipelines prior to both spills. With respect to the company's corrosion monitoring practices, BP also knew that the WOA line had not been pigged since 1998, eight years before the leak, and that the EOA line had not been pigged since 1990, sixteen years before the leak.

On March 31, 2009, both the Department of Justice ("DOJ") and the State of Alaska filed separate civil lawsuits. The DOJ's civil complaint was for violations of the Clean Water Act, the Clean Air Act, and Federal Pipelines Safety Laws. On July 20, 2011, BP-Alaska entered into a consent decree to settle the claims, agreeing to pay $25 million in

civil penalties and make $60 million in improvements to its pipelines in Alaska.

The State of Alaska's civil suit addressed BP-Alaska's alleged violations of state laws mandating compliance with a State-approved oil discharge prevention and contingency plan ("the Plan") and requirements for operating and maintaining a leak detection system. The State's complaint alleged that BP-Alaska "failed to adequately monitor corrosion rates [and] failed to adjust corrosion inhibitor levels in the OTLs" pursuant to the Plan. State of Alaska Compl. ¶¶ 142–45. With respect to BP's failure to adequately monitor corrosion rates, the State's complaint relied on BP-Alaska's October 2007 Guilty Plea to allege that BP "knew that it had insufficient inspection data on the EOA OTL." *Id.* ¶¶ 41, 50. The State also pointed to BP-Alaska's EOA Incident Investigation Report, which concluded that the number of ultrasonic thickness measurements collected by BP "were not sufficient to accurately represent the true condition of the line." *Id.* ¶ 62.

### D. Procedural History

Plaintiffs filed the complaint[5] in 2008, alleging that defendants made false and misleading statements in violation of Sections 10(b), 18(a) and 20(a), and Rule 10b–5 of the Securities Exchange Act of 1934. The United States District

---

[5] The original complaint named as defendants BP, BP America Inc., BP-Alaska, and four officers and/or directors of the companies, including Maureen Johnson, John Browne, Steve Marshall, former director and head of the Board of Directors environmental committee for BP-Alaska, and Walter Massey, former director and head of the Board of Directors environmental committee for BP-Alaska.

Court for the Western District of Washington[6] granted in part and denied in part defendants' motion to dismiss, finding only one of the twenty-five statements to be actionable. That one statement was contained in quarterly filings with the SEC, made in connection with BP-Alaska's obligations to its shareholders, in which the company represented that it would operate Prudhoe Bay pursuant to the "Prudent Operator Standard." Ruling on interlocutory appeal, a panel of this Court reversed, concluding that "[BP-Alaska's] contractual promise to act as a prudent operator did not expressly or implicitly assert that [BP-Alaska] was in full compliance with its obligations thereunder . . . ." *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 693 (9th Cir. 2011). The Court did not reach the issue of scienter.

Plaintiffs' First and Second Amended Complaints add significant facts that came to light during the investigations and lawsuits arising out of the spills. They focus on five types of false or misleading statements: (i) a press statement made by Johnson regarding the most recent inspection data indicating that corrosion was occurring at a low and manageable rate; (ii) two press statements by Johnson suggesting that the March spill was anomalous and distinguishing the WOA OTL conditions with those of the other Prudhoe Bay pipelines; (iii) a statement by CEO Browne at an April 2006 press conference stating that the first spill occurred "in spite of the fact that [BP has] both world class corrosion monitoring and leak detection systems"; (iv) a statement in BP's 2005 Annual Report stating that management believed BP was in compliance, in all material

---

[6] The case originated in the United States District Court for the Central District of California and was subsequently transferred to the Western District of Washington pursuant to 18 U.S.C. § 1404.

respects, with applicable environmental laws and regulations; and (v) statements in the 2004 and 2005 Annual Reports touting BP's "environmental best practices."

The district court dismissed the Second Amended Complaint in its entirety with prejudice for failure to state a claim. Although the court found that some of the statements were actionably false, it dismissed the claims based on the finding that plaintiffs did not plead facts giving rise to a strong inference of scienter. The court concluded that the Second Amended Complaint's allegations "portray a company that poorly understood the challenges it faced in Prudhoe Bay, not one that engaged in securities fraud." This appeal followed.[7]

## II.  THE PLEADING STANDARDS

"We review de novo a district court's grant of a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and for failure to allege fraud with particularity under Federal Rule of Civil Procedure 9(b). " *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc., et al.*, 655 F.3d 1039, 1047 (9th Cir. 2011).

### A.  The Dual Pleading Requirements

Section 10(b) of the Securities Exchange Act of 1934 provides that it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance . . . ."

---

[7] The fifth category of statements regarding "environmental best practices" has been abandoned on appeal.

15 U.S.C. § 78j(b). Pursuant to this section, the Securities and Exchange Commission promulgated Rule 10b–5, which makes it unlawful, among other things, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b).

To state a securities fraud claim, plaintiff must plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Thompson v. Paul*, 547 F.3d 1055, 1061 (9th Cir. 2008) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

At the pleading stage, a complaint stating claims under Section 10(b) and Rule 10b–5 must satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *In re VeriFone Holdings*, *Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). Under Rule 9(b), claims alleging fraud are subject to a heightened pleading requirement, which requires that a party "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). And since 1995, all private securities fraud complaints are subject to the "more exacting pleading requirements" of the PSLRA, which require that the complaint plead with particularity both falsity and scienter. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

### B. Falsity and Materiality

To plead falsity, the complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1)(B). If an allegation regarding the statement or omission is made on information and belief, the complaint must "state with particularity all facts on which that belief is formed." *Id.*

"Central to a 10b–5 claim is the requirement that a misrepresentation or omission of fact must be material." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010). A statement is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1976) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). To plead materiality, the complaint's allegations must "suffice to raise a reasonable expectation that discovery will reveal evidence satisfying the materiality requirement, and to allow the court to draw the reasonable inference that the defendant is liable." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1323 (2011) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)) (internal citations and quotation marks omitted). "Although determining materiality in securities fraud cases should ordinarily be left to the trier of fact, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *In re Cutera*, 610 F.3d at 1108 (internal citations and quotation marks omitted).

## C. Scienter

Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). To adequately plead scienter, the complaint must "state with particularity facts giving rise to *a strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A) (emphasis added). Under the analysis set forth by the Supreme Court in *Tellabs*, a court must first accept all factual allegations in the complaint as true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007). The court must then "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.*

A strong inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id*. at 314. The inference must be that "the defendant[ ] made false or misleading statements either *intentionally* or with *deliberate recklessness.*" *Zucco*, 552 F.3d at 991 (emphasis added) (internal quotation marks omitted). Deliberate recklessness means that the reckless conduct "reflects some degree of intentional or conscious misconduct." *S. Ferry LP, No.2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008). "[A]n actor is [deliberately] reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *In re Oracle Corp. Sec. Litig.*,

627 F.3d 376, 390 (9th Cir. 2010) (quoting *Howard v. Everex Sys., Inc*., 228 F.3d 1057, 1064 (9th Cir. 2000)).

Facts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not independently sufficient. *In re Silicon Graphics Inc. Sec. Litig*., 183 F.3d 970, 974 (9th Cir.1999), *abrogated on other grounds by S. Ferry LP*, 542 F.3d at 784. It may also be reasonable to conclude that high-ranking corporate officers have knowledge of the critical core operation of their companies. *S. Ferry LP*, 542 F.3d at 785–86.

The Supreme Court has emphasized that courts "must review all the allegations holistically" when determining whether scienter has been sufficiently pled. *Matrixx*, 131 S. Ct. at 1324 (quoting *Tellabs*, 551 U.S. at 326). The relevant inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323; *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011).

## III.  DISCUSSION

### A.  Johnson's Assurances About the Low Manageable Corrosion Rate

Turning to the statements at issue, on March 15, 2006, approximately two weeks after the first spill, Maureen Johnson, BP-Alaska Senior Vice President and Greater Prudhoe Bay Performance Unit Leader, told the Associated Press ("AP") that "corrosion was seen in the 34 inch oil transit line [that caused the March 2 spill] in a September

[2005] inspection but appeared to be occurring at a 'low manageable corrosion rate.'"

### 1. *Falsity*

We agree with the district court that plaintiffs have adequately pled the falsity of this statement. Plaintiffs allege that BP's internal documents at the time showed that the corrosion rate at one of the tested areas was 32 mills (thousands of an inch) per year ("MPY") in 2005, compared to only 3 MPY in 2004. They argue that a level of corrosion above 30 MPY is the highest of three levels in BP's own internal classification metric and represents a "sharp and rapid spike in the corrosion rate." Plaintiffs also reference a detailed report of their expert, Dr. Smart, who opined that a corrosion rate of 32 MPY was "high" and "not manageable."

Defendants characterize Johnson's statement as merely incomplete, emphasizing that only one of the 47 locations tested showed a corrosion rate of 32 MPY, and only seven locations showed an increase in corrosion. *See, e.g.*, *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (acknowledging that Rule 10b–5 does not contain a "freestanding completeness requirement"). However, Johnson's statement about the "low and manageable" corrosion rate effectively denied that BP had any warning of high corrosion before the first pipeline leak. This is objectively misleading; according to facts as alleged, inspection data showed objectively high corrosion rates and dramatically increased corrosion in certain places. Given the obvious reality that it only takes corrosion in one spot—and a hole as small as 0.25 inches—to leak 200,000 gallons of oil into the environment, it is self-evident that Johnson's statement was misleading. By omitting information

regarding BP's detection of high corrosion levels, Johnson affirmatively created an "impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (quoting *Brody*, 280 F.3d at 1006).

We also reject defendants' argument that Johnson's statement was immaterial in the wake of the first leak. The complaint focuses on the falsity of Johnson's statement with respect to BP's knowledge of the pipeline problems in advance of the spill. It also alleges facts demonstrating that this was a key question raised in the media and government investigations. Facts demonstrating public interest in the withheld information support its materiality. *See, e.g.*, *In re 2TheMart.com, Inc. Sec. Litig.*, 114 F. Supp. 2d 955, 961 (C.D. Ca. 2000) (pointing to public interest in the company's website development on an online message board as evidence of materiality). And while the spill itself certainly raised public skepticism with respect to BP's pipeline maintenance and corrosion monitoring practices, disclosure of the fact that the company ignored troubling warning signs may have altered the "total mix" of information available to investors, who depend upon BP's management team to make sound decisions. *Basic*, 485 U.S. at 231–32.

2. *Scienter*

The key question is whether plaintiffs have adequately pled the element of scienter. By way of background, Johnson was BP-Alaska's Senior Vice President and Greater Prudhoe Bay Performance Unit Leader during the class period and was directly responsible for the Prudhoe Bay pipeline operations. She holds a Bachelor of Science degree in Chemical Engineering and a Ph.D. in Environmental Science and

20                        REESE V. MALONE

Engineering.[8]  The complaint recites Johnson's involvement
in working with various government bodies to comply with
the Corrective Action Order and her responsibility for
reporting to BP leadership regarding the March spill.

Johnson's statement about the low corrosion rates was
made on March 15, 2006, about two weeks after the first
pipeline leak was discovered on March 2, 2006.  The district
court found that the timing of Johnson's statement
"undermines Plaintiff's argument" that Johnson made them
with scienter.  More specifically, the court reasoned that
Johnson "had no way of knowing in March 2006 that another
leak would occur six months later in a separate pipeline on
the other side of the Prudhoe Bay, so it seems unlikely she
would have intended that her statements deceive investors
about the possibility of future spills in other areas."

We disagree.  With respect to timing, the fact that
Johnson, given her position, made the statement about
corrosion data supports the inference that she made it with
scienter.  In the wake of a crisis that has the potential to

---

[8] Appellant's Opening Brief points to the website of Michigan
Technological University, Johnson's undergraduate alma mater, for
information on her educational background.  *See Chemical Engineering:
2010 Convocation*, *Mich. Technological Univ.*, http://www.chem.mtu.edu/
chem_eng/news/2010/convocation2010.html (last visited Jan. 30, 2014).
Appellee has not challenged the accuracy of this information, and we take
judicial notice of it in accordance with Rule 201 of the Federal Rules of
Evidence.  *See* Fed.R.Evid. 201(b)(2) ("The court may judicially notice a
fact that is not subject to reasonable dispute because it . . . can be
accurately and readily determined from sources whose accuracy cannot
reasonably be questioned."); *see also Daniels-Hall v. Nat. Educ. Ass'n*,
629 F.3d 992, 998–99 (9th Cir. 2010) (taking judicial notice of
information, undisputed by the parties, made available on public school
websites).

repeat itself, Johnson had every reason to review the results of BP-Alaska's corrosion monitoring to understand what happened, as well as to assess the possibility of future leaks in similar pipelines. Evidence of high levels of corrosion would be central to this inquiry. Indeed, BP's monitoring practices and the question of whether the spill could have been prevented were the focus of both public and government inquiries after the March 2006 spill. In this context, Johnson also had a clear motive for omitting information about the detection of high corrosion levels. *See Tellabs*, 551 U.S. at 325 (acknowledging that motive can be a relevant consideration in the scienter analysis); *In re Daou Sys., Inc*., 411 F.3d 1006, 1024 (9th Cir. 2005) (considering evidence of executives' personal motive to perpetuate fraud as one factor in examining the totality of the circumstances). The revelation that BP ignored red flags would portend serious corporate mismanagement, a portent that would be detrimental both to BP and to Johnson personally, as head of the Prudhoe Bay Unit responsible for the spill. In common parlance, if anyone knew of the flawed monitoring program and the likelihood of failures in the pipeline system, Dr. Johnson did.

Furthermore, plaintiffs need not demonstrate that Johnson intended to deceive investors about the likelihood of *future* spills. The fact that she knew her statement was materially misleading is sufficient. *See, e.g.*, *Berson*, 527 F.3d at 987 (finding that once the company "chose to tout [its] backlog, they were bound to do so in a manner that did not mislead investors" by obscuring evidence of past customer stop-work orders). Johnson's statement was misleading, which is significant regardless of whether another pipeline was likely to fail in the immediate future.

The district court went on to apply the *Tellabs* analysis, weighing the competing inferences of fraudulent and non-fraudulent intent.  In doing so, the court concluded that "the inference that . . . Johnson intended to mislead investors by falsely reassuring them that BP's corrosion efforts were adequate . . . is not as strong as the opposing inferences that Johnson misunderstood BP's data or that she did not have access to the data."  Plaintiffs argue that this reasoning does not comply with *Tellabs* because the district court "*sua sponte*" created hypothetical facts outside the Second Amended Complaint to create a stronger non-culpable inference.

In *Tellabs*, the Supreme Court imposed a duty upon courts to weigh *plausible* competing inferences.  *Tellabs*, 551 U.S. at 323–24 ("The strength of an inference cannot be decided in a vacuum . . . a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.").  Here, while it is *possible* that Johnson misunderstood the data or did not, despite her position, have access to it, such a scenario is unlikely under these circumstances.

First, the inference that Johnson misunderstood the data is simply not plausible.  The complaint alleges and supports the fact that the high corrosion levels detected were objectively alarming—the highest of three levels in BP's own internal classification metric—and a dramatic increase from baseline levels.  Accepting these allegations as true, there is little room for misunderstanding on Johnson's part, especially given her role and responsibility as Greater Prudhoe Bay Performance Unit Leader and her expertise as a doctor of Chemical Engineering.

Second, the inference that Johnson did not have access to the corrosion data is directly contradicted by the fact that she specifically addressed it in her statement. As discussed, the timing of the statements and the heightened significance of high corrosion rates in the wake of the first oil spill also undermine it. This case is distinguishable from situations where information may have been obscured from high-level executives. *See, e.g.*, *Glazer Capital Mgmt. v. Magistri*, 549 F.3d 736, 743–49 (9th Cir. 2008) (no strong inference of scienter on the part of the company CEO in the absence of facts showing he was personally aware of illegal payments or that he was actively involved in details of Asian sales). Unlike in *Glazer*, Johnson addressed corrosion rate data specifically, rendering it unlikely that she was not aware of it or the concerning aspects of the company's findings. Moreover, Johnson is not like the CEO of a large enterprise, who may be removed from the details of a specific business line or remote business activity. As Greater Prudhoe Bay Performance Unit Leader, Johnson was directly responsible for the WOA and EOA operations. In this role, not only would Johnson be aware of corrosion problems, but she would be among the first to know. A strong inference of scienter is therefore found in the pled facts.

But perhaps most importantly, Johnson "bridge[d] the [scienter] gap" herself by referencing the data directly. *S. Ferry*, 542 F.3d at 783. It is unclear what further facts plaintiffs would need to plead to create a stronger inference that she had access to information she discussed publicly. To that extent, we agree with plaintiffs' argument that "[b]y making a detailed factual statement, contradicting important data to which she had access, a strong inference arises that she knowingly misled the public as to its clear meaning." *See S. Ferry*, 542 F.3d at 785 (holding that "detailed and specific

24                    REESE V. MALONE

allegations about management's exposure to factual information within the company" support an inference of scienter); *see also Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004) ("The most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, *available to the party*, which contradict the statement.") (emphasis added). Furthermore, when we consider the totality of the circumstances, including the timing of the statement and Johnson's motive to mischaracterize the September 2005 inspection results, there is a strong inference of scienter that is not only cogent, but far more compelling than speculation regarding misunderstanding or lack of access.

## B. Statements Distinguishing the WOA and EOA Lines

Plaintiffs also challenge two statements Johnson made after the first spill contrasting the conditions in the WOA pipeline (where the March spill occurred) and the EOA pipeline (where the August spill would later occur). The first statement was reported in the AP article on March 15, 2006: "Similar problems have not been found in other lines downstream and elsewhere in Prudhoe Bay, and Johnson said it appears the highly corrosive conditions were unique to that line . . . ." The second statement attributed to Johnson appeared in *Petroleum News*, a weekly oil and gas trade publication,[9] on May 14, 2006: "We've looked at all of the same oil transit lines . . . none has the same combination of factors . . . bacteria in the facility, low flow rate and low corrosion inhibitor carry over . . . ."

---

[9] *See Petroleum News*, *available at* www.petroleumnews.com.

REESE V. MALONE                           25

1. *Falsity*

Accepting the allegations in the complaint as true, the statements are plainly false and misleading. Shortly after the second spill, BP-Alaska's Vice President of Regulatory Affairs & Compliance admitted in a letter to regulators that "the causal factors that appear to most strongly influence pitting corrosion," including low flow velocity leading to "Microbiologically Induced Corrosion and/or Under Deposit Corrosion," existed in both the EOA and WOA lines. Another letter in April 2007 from BP-Alaska's regulator highlights BP's acknowledgment that "the primary cause of the March and August 2006 failure was aggressive microbiologically induced corrosion ("MIC") . . . promoted by the particular operating and internal characteristics of the WOA and EOA pipelines, including, but not limited to, low crude oil flow velocities; the corrosivity of the material transported; the presence of water and sediments; an ineffective corrosion inhibitor program; and a lack of maintenance pigging." And a September 2006 memorandum preparing BP officials to testify before Congress states, "There is a certain amount of similarity between the EOA and WOA oil transit pipelines. Because of these similarities it was believed the pipelines also had similar conditions." On this basis, it is clear that plaintiffs have adequately pled the falsity of Johnson's statements contrasting the WOA and EOA lines.

Defendants argue that the statements are not false or materially misleading because they pertain to "[BP-Alaska]'s preliminary assessments of the corrosive conditions of the OTLs, which were subject to change based on the Company's ongoing review and subsequent pigging of the OTLs." Even if that were the case, Johnson's statements do not explicitly

state or even imply that the findings are preliminary or somehow incomplete. Indeed, the second statement in May 2006, almost two months after the first spill, indicates that it was informed by post-spill inspections demonstrating the uniqueness of the WOA OTL conditions. Yet the complaint contains significant facts suggesting: (1) BP was aware of the high risk of corrosion and the inadequacies of their corrosion monitoring policies years before the spill; (2) BP knew that the EOA line had not been pigged since 1990 and that there was insufficient inspection data on the line; and (3) BP had not yet complied with the Corrective Action Order requiring it to smart pig the EOA, which the pleadings suggest is the only truly reliable method of measuring corrosion. Accepting these allegations as true, it was false and misleading for Johnson to make statements distinguishing the conditions in the WOA and EOA lines in March and May of 2006.

Defendants also argue that the public was aware of the similarities between the lines, and therefore Johnson's statement contrasting them was not misleading. We disagree. The CAO merely notes the general similarities in the conditions and maintenance of the lines and suggests a comparable risk of corrosion. In the face of that information, Johnson made more specific statements suggesting that a review had been conducted and the lines were actually different in respects material to the spill. Her statements lend an element of certainty to a situation previously indicating risk, which is inherently misleading. *See, e.g.*, *Berson*, 527 F.3d at 987 ("It goes without saying that investors would treat [risk and certainty] differently.").

## 2. *Scienter*

The district court found that plaintiffs failed to adequately allege scienter.  Relying once again on the timing of Johnson's statements, the court found it more plausible that Johnson's statements simply "summarize[d] the preliminary results of [BP-Alaska's] ongoing investigation of the March spill."  The court also found that plaintiffs did not show that Johnson was aware of information making her statements false.  Considering the "totality of the circumstances," as instructed by the Supreme Court in *Tellabs*, we disagree.

### a. *Evidence of Contemporaneous Knowledge*

The regulators' Corrective Action Order, delivered to Johnson on March 15, 2006, stated that the WOA Line was "one of three similar low-stress pipelines" operated by BP.  Specifically, the agency found that the WOA and EOA lines were "constructed around the same time, operate[d] in similar environmental conditions, transport[ed] the same quality crude oil that contributed to the cause of the internal corrosion in PBWOA, and [were] operated and maintained in a similar manner."  It was the similarity between lines that prompted the agency's conclusion that "the continued operation of [BP-Alaska's] WOA [and] EOA . . . without corrective measures will be hazardous to life, property and the environment."  Plaintiffs note that Johnson indisputably had access to this information when she made the March statement, and at least two months prior to making the May statement.

The complaint also contains information directly contradicting Johnson's statements, much of which came to light through discovery related to government investigations,

civil lawsuits and associated guilty pleas in the months and years following the spills.  The district court dismissed this circumstantial evidence of scienter because "[e]ach of the documents contradicting Johnson's March and May 2006 statements regarding the two pipelines is dated after she made the statements in question."  In doing so, the district court overlooked significant evidence of scienter that can be gleaned from these later disclosures.

Plaintiffs need not show that the documents existed at the time that the misleading statements were made.  *See Roncini v. Larkin*, 253 F.3d 423, 437 (9th Cir. 2001).  Temporal proximity of an allegedly fraudulent statement or omission and a later disclosure can be circumstantial evidence of scienter.  *Id*.; *see also Berson*, 527 F.3d at 988 n.5 (SEC disclosure two weeks after a misleading statement "bolsters the inference" that defendants had knowledge when they made the statement).  Here, the district court discarded as irrelevant the August 31, 2006 letter sent by BP-Alaska to PHMSA stating that both the EOA and WOA pipelines had "low flow velocities" and were susceptible to microbiologically induced corrosion.  The court also disregarded the September 2006 memorandum preparing BP officials to testify before Congress, which acknowledged similarity between the EOA and WOA.  Specifically, when questioned as to how BP could have been confident of the EOA condition without a more extensive testing regime, BP pointed to the fact that there was a certain amount of similarity between lines, and that  "[b]ecause of these similarities it was believed the pipelines also had similar conditions."

Because the statements and the contradictory disclosures are separated by three to six months, they may not

independently establish scienter. However, given the relatively constant, long-term nature of the information, we believe they bolster the inference of scienter—particularly when considered in conjunction with other facts alleged in the complaint. *S. Ferry*, 542 F.3d at 784 ("[F]ederal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective.").

There is nothing in the record suggesting that flow velocity and susceptibility to corrosion were factors that ever differed in the WOA and EOA lines. To the contrary, BP's historical data between 1996 and 2006 shows that the WOA and EOA lines exhibited the lowest flow velocities during that ten year period—at a rate two to three times slower than the majority of the other OTLs. The two lines also had the "most" variations from the desired level of basic sediment and water during that period. BP-Alaska was monitoring these factors for years before the spills and was aware that the WOA and EOA lines had similar conditions with a higher risk of corrosion compared to the other lines. This fact is bolstered by the September 2006 memorandum indicating that BP-Alaska took the similarities into account when devising a testing regime for the EOA. Although this information does not prove scienter with respect to Johnson, it certainly strengthens the inference significantly.

The complaint also alleges that on May 5, 2006, nine days before Johnson's May 14 statement, BP's Board received a memorandum prepared by David K. Peattie, BP's Vice President for Exploration and Production, stating that "[i]nspections [have] indicated that the corrosion which led to the leak may not [have been] an isolated case," and that pigging was needed to verify the structural integrity of those

30                    REESE V. MALONE

lines.  The complaint alleges that Johnson was tasked with reporting to BP executives regarding the BP-Alaska's response to the Prudhoe Bay spills.

The district court emphasized that plaintiffs did not show that Johnson herself was aware of information making her statements false.  Although some of the circumstantial evidence supporting scienter is not directly linked to Johnson in the complaint, we can impute scienter based on the inference that key officers have knowledge of the "core operations" of the company.  *See S. Ferry*, 542 F.3d at 784–86 (upholding the core operations inference after *Tellabs*).  When we consider these inferences under the totality of the circumstances, we find a strong inference of scienter that is not outweighed by any competing inferences.

### b.  The Core Operations Inference

Allegations regarding management's role may help satisfy the PSLRA scienter requirement in three circumstances. First, the allegations may be viewed holistically, along with other allegations in the complaint, to raise a strong inference of scienter under the *Tellabs* standard.  *Id*. at 785–86. Second, the allegations "may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information," as in *Daou*, 411 F.3d at 1023, and *Oracle*, 380 F.3d at 1234.  *S. Ferry*, 542 F.3d at 786.  Third, in rare circumstances, such allegations may be sufficient, without accompanying particularized allegations, where the nature of the relevant fact is of such prominence that it would be "absurd" to suggest that management was without knowledge of the matter.  *Id.* (citing *Berson*, 527 F.3d at 988).

Johnson is BP-Alaska's Senior Vice President and Greater Prudhoe Bay Performance Unit Leader, overseeing operations in the area where the spill took place. The complaint alleges additional facts regarding her role during the aftermath of spills. First, the Corrective Action Order from regulators was addressed directly to Johnson. She was also responsible for reporting to BP leadership regarding the response to the spills in Prudhoe Bay. And finally, she took an active role in communicating to the press regarding the condition of the pipelines in the wake of the spills. From these allegations, it is clear that Johnson is in a position of knowledge; indeed, she appears to be both the external and internal gatekeeper of information on the Prudhoe Bay pipelines. On the basis of these facts alleged in the complaint, we find it absurd to believe that she did not have *knowledge* of information contradicting her statements. At the very least, Johnson had knowledge that it would be deliberately reckless to make those statements in March and May of 2006.

Turning first to the absurdity analysis, the seminal case is *Berson v. Applied Signal Technology, Inc*., 527 F.3d 982 (9th Cir. 2008). There, plaintiffs did not allege *any* specific facts showing that individually named officers actually knew about large customer stop-work orders. *Id.* at 987–88. Nevertheless, the court held that plaintiffs demonstrated a "strong inference" of scienter based on the officers' positions and the nature of the misstatements. *Id.* at 988. The officers were "directly responsible for [the company's] day-to-day operations," and the stop work orders "were prominent enough that it would be 'absurd to suggest' that top management was unaware of them." *Id.* (citing *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 943 n. 21 (9th Cir. 2003)).

Here, it is absurd to think that Johnson, as head of the Prudhoe Bay operations and an experienced chemical engineer, was without knowledge of the comparable condition of the WOA and EOA lines when she made her "uniqueness" statements.  The evidence indicates that the lines were objectively similar with comparable conditions documented for at least a decade.  BP admits having treated the pipelines the same for the purposes of monitoring practices on the basis of their similarity.  It is also as absurd to think that Johnson was unaware of the paucity of inspection data on the EOA line in light of the fact that it had not been smart pigged in 16 years.  This information is the epitome of "core" to pipeline operations at Prudhoe Bay.  Compared to the stop-work orders in *Berson*, which were news-oriented—thereby significantly reducing the time management had to absorb the information—here the information we are imputing to Johnson is fundamental to operations of her business over the tenure of her career.  In that sense, it is even more absurd to suggest that Johnson was unaware of it.

The "actual access" analysis also supports scienter, because Johnson's statements are specific and reflect her access to the disputed information.  There is a stronger inference of scienter here than in situations where executives are held responsible for the falsity of accounting statements.  *See Daou*, 411 F.3d at 1023–24 (finding that plaintiffs pled scienter based on specific allegations of direct involvement in the production of false accounting statements and reports); *Oracle*, 380 F.3d at 1234 (top executives' admittedly detail-oriented management style led to reasonable inference that they were aware of significant accounting irregularities).  Here, Johnson's statements were her own very specific representations of the company's findings.  The May 2006

statement, which makes references to specific conditions found in the pipelines, strongly suggests she had access to the disputed information and the total mix of allegations make such a conclusion irrefutable.

Both the absurdity and actual knowledge analysis are sufficient to create a strong inference of scienter. But looking at the totality of the circumstances under the *Tellabs* analysis makes the inference irresistible. The speculation that Johnson was merely summarizing a preliminary investigation does not outweigh the strong inference of scienter in light of the allegations discussed above, including the alleged pattern of deception that followed.

## C. Statement Regarding BP's "World Class" Leak Detection System and Corrosion Monitoring Program

Plaintiffs also focus on a statement by BP's CEO John Browne at a press conference on April 25, 2006. Browne stated that the first spill occurred "in spite of the fact that we have both world class corrosion monitoring and leak detection systems, both being applied within regulations set by the Alaskan authorities." The district court was correct in finding that these statements appear to be false based on the results of later investigations revealing that the pipelines were under-inspected, under-maintained, and subject to severe risk of corrosion-related failure.

The district court was also correct that plaintiffs do not allege facts sufficient to *independently* create a strong inference of scienter. They do not allege facts showing that Browne knew about the problems when he made the statement. And under the core operations inference analysis,

plaintiffs would have to show that it would be "absurd to suggest management was without knowledge of the matter" or that the facts "are particular and suggest that defendants had actual access to the disputed information." *S. Ferry*, 542 F.3d at 786.

To that extent, plaintiffs do not set forth specific facts supporting an inference that Browne had "actual access" to the information when he made his statement. In this instance, the timing of the statement, under the totality of the circumstances, does not support a strong inference of scienter. The statement was made at a press conference only a month after the first spill. The district court noted that the Board did not receive a detailed update about the spill until ten days after Browne's press conference. It also noted that the Corrective Action Order did not speak in terms of specific legal violations.

Accordingly, a strong inference of scienter is not found in the pled facts. Given this conclusion, we affirm only with respect to Browne on plaintiffs' first claim for relief for violation of § 10(b) and Rule 10b–5.

## D. Annual Report Statement Regarding Compliance with Environmental Laws and Regulations

Plaintiffs also take issue with BP's 2005 Annual Report, issued on June 30, 2006, which states, "Management believes that the Group's activities are in compliance in all material respects with applicable environmental laws and regulations." The Report also disclosed that BP was "in discussion with PHMSA on assuring compliance with the corrective actions outlined in the order." Accepting the truth of the alleged facts for the purposes of this motion, we find no reasonable basis

for management's "belief" that BP was in material compliance with applicable environmental laws and regulations.  Moreover in light of the significant, public nature of the potential compliance issues, we find it most unlikely that top management was unaware of facts undermining its belief in compliance.

1. *Falsity*

Statements of legal compliance are pled with adequate falsity when documents detail specific violations of law that existed at the time the warranties were made. *See Glazer*, 549 F.3d at 741–42 (finding a statement regarding "compliance in all material respects with all laws" to be actionably false when the complaint points to an SEC cease and desist order issued 11 months later detailing violations of Section 13 of the Exchange Act and the Foreign Corrupt Practices Act).  Here, the complaint cites evidence of numerous violations, confirmed and alleged, of environmental laws and regulations, including: (1) the Clean Water Act, evidenced by BP's 2007 Guilty Plea with the DOJ; (2) Alaskan laws, evidenced by the company's civil settlement with the State; and (3) Pipeline Safety Laws, arising from BP-Alaska's failure to comply with PHMSA's March 15, 2006 COA.  Based on these allegations—the validity of which were ultimately confirmed by the company's guilty plea, consent decree, and millions of dollars in fines and penalties—defendants cannot say that they were in compliance, in all material respects, with applicable environmental laws and regulations.

The district court found the Annual Report statements too "vague and ambiguous" to support the allegation of falsity. Specifically, the court found that the statement could have

"encompass[ed] the state of affairs described in the Hayward memorandum—that 'efforts [were] underway with the [regulator] to either amend or extend the compliance order to address these issues.'" *Id.*

While ongoing discussions with regulators suggest some *effort* to achieve compliance, these efforts do not negate the pre-existing, significant violations of federal and state environmental laws alleged in the complaint. The alleged violations of the Clean Water Act arose, in part, from the March 2006 "unauthorized discharge[ ] of crude oil into navigable waters of the United States," as well as "violations of the Spill Prevention Control and Countermeasure (SPCC) regulations promulgated pursuant to the Clean Water Act." The basis for pled violations of Alaskan law arose from BP-Alaska's allegedly non-compliant corrosion monitoring and management systems, as well as its failure to comply with its own Spill Prevention Plan, as required by state law. And finally, the Pipeline Safety Laws were implicated by "[BP-Alaska]'s failure to comply with [the PHMSA CAO] pursuant to 49 U.S.C. § 60112, requiring [BP-Alaska] to perform corrective action on its pipelines."

Had BP actually complied with the Corrective Action Order at the time the statements were made, there may have been some basis for believing that BP had achieved "compliance in all material respects." But in this case, defendants had yet to take critical steps towards corrective action. Most importantly, BP had yet to follow orders to pig the EOA line, where the second spill would take place only a month later. And BP did more than fall a little short on meeting the deadline; according to the complaint, compliance on six Corrective Action Order mandates was not achieved, and in certain cases not even attempted, for as long as five

months after the deadline.    Nor had BP received an amendment of or extension to the Corrective Action Order at the time the Annual Report was issued.  Based on allegations before us, we see no basis for the belief that BP had achieved compliance in "in all material respects with applicable environmental laws and regulations" by June 30, 2006.

The next question is whether BP escapes possible liability by prefacing the statement with the phrase "management believes," and using the qualifier *material* compliance.  While the district court was correct to recognize that these terms weigh against falsity, we have not discerned facts supporting management's "belief" in material compliance under the circumstances.

A statement of belief is a "'factual' misstatement actionable under Section 10(b) if (1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *Kaplan v. Rose*, 49 F.3d 1363, 1375 (9th Cir. 1994) (citing *In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 930 (9th Cir. 1993), *superseded by statute on other grounds*, 15 U.S.C. § 78u-4(b)(1)); *In re Cooper Sec. Litig.*, 691 F. Supp. 2d 1105, 1115 (C.D. Ca. 2010).  The mere fact of ongoing "discussions" with regulators is insufficient to create a belief in "material compliance" with the law.  Here, the violations of environmental law were egregious—BP had just spilled over 200,000 gallons of oil onto the Alaskan tundra in violation of the Clean Water Act.  Its corrosion monitoring and leak detection systems fell below industry standards and state requirements.  And the discussions with regulators took place in the context of recent violations of the terms of the Corrective Action Order, imposed to mitigate "hazard[s] to

life, property and the environment." Based on the pled facts, it is unclear how BP's management could consider the company to be "in compliance" or, alternatively, could view the violations to be immaterial.

For the foregoing reasons, we find that plaintiffs have adequately pled falsity.

### 2. *Scienter*

A more difficult question is whether there is a strong inference of scienter. Unlike the other allegedly misleading statements at issue, the Annual Report statement is not attributed to a particular individual. It is, however, a self-purported statement of "management['s]" beliefs. Accordingly, the district court properly conducted the *Berson* absurdity test, but found that "[p]laintiffs do not allege that information regarding compliance with the CAO was prominent enough that it would be absurd to suggest that top management was unaware" of the information.

We have a different view of the pled facts. The complaint and materials incorporated by reference establish the prominence of the issue of compliance with environmental laws and regulations, including the Corrective Action Order. They detail the significant federal and state government intervention into BP's operations after the March 2006 spill. Moreover, the fact that the Annual Report itself discussed the March spill and the Corrective Action Order also underscores the prominence of the issue. And perhaps most importantly, the former CEO requested updates on the company's response to the spill in the form of briefing memoranda, which is direct evidence of its prominence in the eyes of BP's top management. In light of the magnitude of the violations,

the immense public attention on BP in the wake of the spills, and the contemporaneous documents demonstrating management's awareness of the company's non-compliance with the Corrective Action Order, we find it "absurd" that management was not aware of BP's significant, existing compliance issues that rendered the statement misleading.

The Annual Report language also belies an inference of non-culpability. On the one hand, by positioning the statement as "management's belief" and including the caveat regarding compliance *in all material respects*, BP signaled to the market that it is an opinion subject to debate or error. On the other hand, it also indicates awareness that such a belief may be unfounded. The paragraph containing the statement at issue reads:

> Management cannot predict future developments, such as increasingly strict requirements of environmental laws and the resulting enforcement policies thereunder, that might affect the Group's operations or affect the exploration for new reserves or the products sold by the Group. A risk of increased environmental costs and impacts is inherent in particular operations and products of the Group and there can be no assurance that material liabilities and costs will not be incurred in the future. In general, the Group does not expect that it will be affected differently from other companies with comparable assets engaged in similar businesses. *Management believes that the Group's activities are in compliance in all*

*material respects with applicable environmental laws and regulations.*

BP p.l.c., Annual Report (Form 20-F) at 69 (June 30, 2006) (emphasis added).

The language alerts investors regarding the potential for future compliance issues to have an adverse impact on the company. But at the same time, it puts the emphasis on *unpredictable* risks that would not disproportionately affect BP, while denying any belief in risks unique to the company in the wake of the spill. In this context, the statement regarding management's belief in compliance appears to be made with intent to downplay BP's non-compliance with *existing* laws and regulations. In this context, we believe the inference of an intent to mislead investors with respect to the BP's role in causing the spill is strong and as compelling as the possibility that top management simply lacked information about the company's compliance issues.

### E. Holistic Scienter Analysis

In *Matrixx*, the Supreme Court emphasized that courts must "review all the allegations holistically" when determining whether scienter has been sufficiently pled. *Matrixx*, 131 S. Ct. at 1324 (quoting *Tellabs*, 551 U.S. at 326) (internal quotation marks omitted). First, the court determines whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter. *Tellabs*, 551 U.S. at 322–23; *N.M. State Inv. Council*, 641 F.3d at 1095. "[S]econd, if no individual allegation is sufficient, the court is to conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to

create a strong inference of intentional conduct or deliberate recklessness. *N.M. State Inv. Council*, 641 F.3d at 1095.

After finding that none of the individual allegations was sufficient to plead scienter, the district court conducted the holistic analysis and found that it "yields the same result, because in every case the strength of the inferences that plaintiffs ask the Court to draw is exceeded by plausible, nonculpable explanations for [defendants'] conduct." The relevant inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets the standard." *Tellabs*, 551 U.S. at 323 (emphasis in original); *N.M. State Inv. Council*, 641 F.3d at 1095.

The district court also concluded that "[a]t all periods, the statements and conduct that plaintiffs allege more closely resembles simple corporate mismanagement than actionable securities fraud." While we agree that BP's actions exemplify corporate mismanagement, the pleadings also charge that BP is a company that has publicly shirked responsibility for its role in causing the Prudhoe Bay spills at every step of the way. And while there may not be enough in the complaint to establish scienter with respect to CEO John Browne's statement on April 25, 2006, it gives us pause that only weeks after a devastating oil spill, BP's CEO was willing to make a public statement that the spill occurred "in spite of the fact that [BP has] world class corrosion monitoring and leak detection systems, both being applied within regulations set by the Alaskan authorities." According to the allegations in the complaint, as well as BP's later admissions, this statement had no basis in reality.

REESE V. MALONE

To some extent, corporate mismanagement would be a plausible explanation for how misinformation travels to the corporate suite. But in this case, facts alleged in the complaint support the conclusion that BP had been aware of corrosive conditions for over a decade, and yet chose not to address them. The complaint also alleges that BP intentionally adopted corrosion monitoring practices that deviated from industry standards in an effort to cut costs. And it suggests that BP had every reason to know, at the very least, that they did not have accurate information regarding the condition of the Prudhoe Bay pipelines. When we consider the allegations holistically and accept them to be true, as we must, the inference that BP was, at the very least, deliberately reckless as to the false or misleading nature of their public statements is "at least as compelling as any opposing inference." *Matrixx*, 131 S. Ct. at 1324 (citing *Tellabs*, 551 U.S. at 324).

## CONCLUSION

In the end, we conclude that after six years of preliminary litigation, the allegations should now be tested on the merits. We return the matter to the district court for that purpose. For the foregoing reasons, the judgment of the district court is **REVERSED IN PART and AFFIRMED IN PART.** Each party shall bear their own costs.